UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HIEU PHAM,

    Plaintiff,

    v.

BRIAN BAST, et al.,

    Defendants.

Case No. 17-cv-04194-WHO

**ORDER ON DEFENDANTS' MOTION IN LIMINE #3**

Re: Dkt. No. 98

In their third motion in limine, defendants The Regents of the University of California ("University") and Dr. Brian Bast (collectively, "the defendants") seek to exclude any argument or evidence that other employees "complained about various things and adverse actions were ostensibly taken against them," so as to establish a pattern of retaliation by Dr. Bast. Dkt. No. 98 at 5:3-8:5. The motion identified four other employees: Dr. Dennis Song, Tina Valaris, Annamarie Abrantes-Li, and Dr. Mark Crane. *Id*.

When the Ninth Circuit found that there were sufficient genuine issues of material fact regarding pretext so as to survive summary judgment, it made a brief reference to "evidence in the record . . . that other employees of the department experienced negative treatment after complaining about fraud and mismanagement to their supervisor." *See Pham v. Bd. of Regents of Univ. of Cal.*, 856 Fed. App'x 707, 708 (9th Cir. 2021). The court did not identify the employees to which it referred. *See id.* This Order considers the circumstances of Drs. Song and Crane, Valaris, and Abrantes-Li as a result of the court's statement.

"Me too" evidence may be used to "show motive or intent, or for other non-propensity purposes." *Zucchella v. Olympusat, Inc.*, No. CV-19-7335, 2023 WL 2633947, at *16 (C.D. Cal. Jan. 10, 2023) (citing cases). The case law surrounding "me too" evidence largely arises in the

context of harassment or discrimination claims, which are not at issue here. That authority traces back to the Supreme Court's decision in *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008), where the Court held that Federal Rules of Evidence 401 and 403 did not make evidence of discrimination by other supervisors *per se* admissible or inadmissible in the context of an individual Age Discrimination in Employment Act ("ADEA") case. Instead, the Court wrote, the question of whether this evidence is relevant "is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id*.

Courts have used this or substantially similar language in considering "me too" evidence in cases involving other types of claims and conduct, including retaliation. *See, e.g., McCoy v. Pac. Mar. Ass'n*, 216 Cal. App. 4th 283, 298 (Cal. Ct. App. 2013) (finding that the lower court erred by making a blanket exclusion of evidence of retaliation against two other female employees, and should have considered whether that evidence "presents factual scenarios involving other employees that are 'sufficiently similar' to those presented by appellant in her retaliation claim") (citing in part *Sprint/United Management*, 552 U.S. at 388); *Pinter-Brown v. Regents of Univ. of Cal.*, 48 Cal App. 5th 55, 89 (Cal. Ct. App. 2020) (writing in a gender discrimination case that "the admissibility of 'me too' evidence hinges on how closely related the evidence is to the plaintiff's circumstances and theory of the case"); *Stovall v. Align Tech., Inc.*, No. 18-CV-07540-EJD, 2022 WL 899416, at *12 (N.D. Cal. Mar. 28, 2022) (finding in a sex discrimination case that although "me too" evidence may be used to "establish discriminatory motive, there must be evidence that the other allegedly wronged employees were similarly situated to plaintiff"). At the end of the day, "'[m]e too' evidence is a relevancy issue." *See Patterson v. Boeing Co.*, No. CV-16-7613, 2018 WL 5937911, at *20 (C.D. Cal. Apr. 4, 2018) (citing *Sprint/United Mgmt. Co.*, 552 U.S. at 388).

Based on this authority, and the Ninth Circuit's statement about the evidence in this case, the admissibility of the "me too" evidence regarding Abrantes-Li, Dr. Crane, Dr. Song, or Valaris depends on how closely related that evidence is to Dr. Pham's circumstances and theory of the case. *See Sprint/United Mgmt. Co.*, 552 U.S. at 388. In making this fact-based determination, I

have reviewed and considered the parties' briefings on the motions in limine, their offers of proof, the briefing and evidence presented to me on summary judgment, the briefing before the Ninth Circuit on appeal, and a decision from Hon. Saundra Brown Armstrong concerning Dr. Song, which I discuss in further detail below.

Dr. Crane's "me too" evidence is not related to Dr. Pham's circumstances and theory of the case. Although the proffered deposition testimony is incomplete, it appears that Dr. Crane complained to the chancellor that Dr. Bast "was not making evaluations of faculty" based on professional performance, as required by the University bylaws. *See* Pl.'s Offer of Proof [Dkt. No. 114] Ex. 13 ("Crane Depo.") 34:10-35:1. As evidence of Dr. Bast's purportedly retaliatory conduct, Dr. Pham notes that "[s]hortly after Dr. Crane gave his deposition in this action accusing Dr. Bast of misconduct, his volunteer position of nearly two decades was terminated." *See* Pl.'s Offer of Proof at 3:10-13 (citing Dkt. No. 47-21). Crane's complaint (that Dr. Bast was not evaluating faculty in accordance with University protocol) is significantly different from Dr. Pham's (that Dr. Perkins' actions were unsafe), as is the purportedly protected activity (giving a deposition versus making a protected complaint about a colleague). Moreover, Dr. Pham has not sufficiently connected the end of Dr. Crane's volunteer appointment with Dr. Bast; the letter that Dr. Pham offers in support is signed by a human resources employee. *See* Dkt. No. 47-21 (letter notifying Dr. Crane that his appointment would end). Any "me too" evidence related to Dr. Crane is excluded.[1]

"Me too" evidence about Valaris, on the other hand, is more closely related to Dr. Pham's circumstances and theory of the case.[2] Valaris stated in her deposition that she worked for the University's OMFC clinic for about three weeks before Dr. Bast and the clinic manager told her "it wasn't working out," without any discussion from Dr. Bast about why she was being terminated. *See* Dkt. No. 46-11 ("Valaris Depo.") at 8:18-9:12. She further testified that about a

---

[1] Dr. Pham did not contest my tentative decision to exclude any "me too" evidence relating to Dr. Crane at the June 12, 2023, Pretrial Conference.

[2] The defendants did not contest my tentative ruling allowing the "me too" evidence relating to Valaris at the Pretrial Conference.

1  week before her termination, she had reported to Dr. Bast concerns about timecard fraud and
2  monies that she believed needed to be refunded to patients and potentially the government. *Id.* at
3  22:3-23:10, 43:17-44:14, 47:6-23, 49:9-50:7. It appears from her deposition that she made a
4  whistleblower complaint around the same time. *See id.* at 18:22-25, 22:24-23:7, 89:8-92:8. Like
5  Dr. Pham, Valaris attests that she made a protected complaint and suffered an adverse employment
6  action as a result. Her "me too" evidence is relevant to Dr. Bast's motive or intent in reducing Dr.
7  Pham from a 50% FTE employment to a 40% FTE employment, and thus is admissible.
8        Abrantes-Li also testified that she reported suspected timecard fraud to Dr. Bast, although
9  Dr. Bast did not recall that she did so. A critical difference between her "me too" evidence and
10  that of Valaris is that the alleged retaliation against Abrantes-Li does not amount to an adverse
11  employment action. In her deposition, Abrantes-Li stated that after she reported this fraud to
12  Valaris, another supervisor, and Dr. Bast, she suffered retaliation in that coworkers told her that
13  she was performing her job incorrectly. *See* Pl.'s Offer of Proof, Ex. 9 ("Abrantes-Li Depo.") at
14  7:14-8:13, 9:4-15, 11:25-12:20. She further stated that although she reported this to Dr. Bast, he
15  did not stop her co-workers from complaining. *Id.* at 13:3-25. Abrantes-Li alluded to this
16  behavior when describing her decision to retire (stating that there was "too much uncertainty," "a
17  lot of things that I don't like," and that she felt "helpless"): importantly, she confirmed that she
18  was never terminated, disciplined, or demoted. *See id.* at 15:1-9, 36:17-37:3. Although an
19  adverse employment action is not limited to these three scenarios, there is also case law stating
20  that "a mere offensive utterance or even a pattern of social slights by either the employer or co-
21  employees cannot properly be viewed as materially affecting the terms, conditions, or privileges of
22  employment" as required to show that an adverse employment action took place. *Yanowitz v.*
23  *L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1054 (Cal. 2005); *see also Light v. Dep't of Parks &*
24  *Recreation*, 14 Cal. App. 5th 75, 92 (Cal. Ct. App. 2017) ("[M]ere oral or written criticism of an
25  employee . . . does not meet the definition of an adverse employment action.") (citation omitted).
26  Indeed, this is reflected in the proposed final jury instruction defining "adverse employment
27  action" in the context of the section 1102.5 claim, which tracks the state's model instruction and
28  which the parties jointly proposed. *See* Dkt. No. 112 at 24 ("[M]inor or trivial actions or conduct

4

that is not reasonably likely to do more than anger or upset an employee cannot constitute an adverse employment action."); *see also* CACI No. 2509.  Without an adverse employment action, Abrantes-Li's circumstances are significantly different from Dr. Pham's.

Further distinguishing Abrantes-Li's circumstances from Dr. Pham's, her complaint about Dr. Bast is about his inaction, as opposed to action.  He did not even discuss her decision to retire with her, but learned that she left after the fact.  *See* Dkt. No. 49-2 ("Bast Decl.") ¶ 6.  Indeed, Dr. Bast has no recollection of any concern that Abrantes-Li brought to him, and there are no records that have been presented to contradict his testimony.  *See id*. ¶ 5.

But even if Abrantes-Li's testimony was conceivably relevant to Dr. Bast's intent with respect to Dr. Pham, any probative value is substantially outweighed by a danger of confusing the issues, undue delay, and wasting time, and merits exclusion under Federal Rule of Evidence 403. Her testimony would result in a mini trial over the impact of the alleged comments from her coworkers, whether she ever complained to Dr. Bast, and whether any of it ultimately constituted an adverse employment action.  Although Abrantes-Li may testify about other matters relevant to Dr. Pham's claims, any "me too" evidence related to her is excluded.

The same is true for Dr. Song, a volunteer professor at the clinic.  Dr. Song stated in his deposition that less than two months after he emailed Dr. Bast his concerns about patent safety and care, disorganized systems and structures within the clinic, and a lack of what he considered appropriate training for students, Dr. Bast told him that he would not renew his faculty appointment for the 2017 academic year.  *See* Dkt. No. 46-12 ("Song Depo.") at 26:3-27:17, 31:25-32:8.  Dr. Song further testified that this was essentially an act of termination.  *Id.* at 32:6-8. This testimony was presented at summary judgment in this case and to the Ninth Circuit, and Dr. Song may well have been one of the employees the court had in mind.

Not in the record before the Ninth Circuit, though, was a decision that was handed down after it ruled: Judge Armstrong determined, as a matter of law, that the University and Dr. Bast did not retaliate against Dr. Song for his complaints.  *See Song v. Regents of the Univ. of Cal.*, No. 19-CV-02732-SBA, 2021 WL 4481662, at *1 (N.D. Cal. Sept. 30, 2021).  Dr. Song had sued the defendants because he thought he had been retaliated against, relying on the same complaints,

1  emails, and actions to which he testified in this case. *See id.* at \*2-4. Judge Armstrong granted
2  summary judgment in the defendants' favor after finding that Dr. Song had not created a genuine
3  issue of material fact on whether the non-renewal of his appointment was motivated by his
4  protected speech. *See id*. at \*9. Judge Armstrong cited evidence showing: (1) in Dr. Song's April
5  2017 email to Dr. Bast, he informed Dr. Bast that he intended to stop volunteering with the
6  department, and that under University policy he could not have maintained his appointment
7  without teaching; (2) Dr. Song raised his concerns in another email he sent Dr. Bast in May 2016,
8  at least a year before the allegedly retaliatory actions; (3) Dr. Song had also complained to
9  students about the quality of the department; and (4) Dr. Bast had no authority over another
10 department's decision not to offer Dr. Song an appointment. *See id*. at \*9, \*13-14.

11     Judge Armstrong's decision raises two important issues for me. First, a district judge
12 found that there were no disputed facts to support Dr. Song's claim of retaliation. Dr. Song
13 appealed Judge Armstrong's decision, and the matter settled on appeal, but her opinion is
14 persuasive. Second, the evidence cited in that decision, which I reference above, is not closely
15 related to Dr. Pham's circumstances.

16     The defendants argue that because a court has determined that Song was not retaliated
17 against, "his circumstances cannot serve as evidence of a pattern or practice of retaliation." Defs.'
18 Supplemental Brief [Dkt. No. 116] at 2:16-18. I agree. If Dr. Song were to testify about this "me
19 too" evidence, the defendants' first question on cross-examination would almost certainly be about
20 Judge Armstrong's findings. This would open the door to yet another mini trial, this time on a
21 subject where my colleague determined there were no material facts in dispute and that Dr. Song
22 was not retaliated against. And the evidence presents a very different circumstance to Dr. Pham's.
23 This evidence risks confusing the issues, wastes time, and is more prejudicial than probative. It
24 warrants excluding any "me too" evidence concerning Dr. Song under Rule 403.

25     This case is about what Dr. Pham experienced, and whether he was retaliated against.
26 While the Ninth Circuit said that there was evidence that other employees experienced negative
27 treatment after complaining about fraud and mismanagement to their supervisor, it did not
28 reference any particular employee whose treatment would be relevant to Dr. Bast's intent in his

1  conduct toward Dr. Pham.  The memorandum disposition referred twice to viewing the record
2  cumulatively, specifying that Dr. Pham's appointment structure changed to his detriment after his
3  complaint and that there was temporal proximity between the complaint and that action, in
4  addition to the other employees' complaints.  *See Pham*, 856 Fed. App'x at 708.  This Order aligns
5  with the Ninth Circuit's comment in that the "me too" evidence about Valaris is permitted.  I have
6  carefully considered the circumstances of the other witnesses identified by defendants in the third
7  motion in limine and conclude in light of the law regarding the use of "me too" evidence and my
8  fact-based analysis that they are not closely related to Dr. Pham's circumstances and theory of the
9  case and are also barred by Rule 403.

The defendants' third motion is limine is DENIED regarding the "me too" evidence about Valaris.  It is otherwise GRANTED.

**IT IS SO ORDERED.**

Dated: June 15, 2023



William H. Orrick
United States District Judge