UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HIEU PHAM,<br><br>    Plaintiff,<br><br>    v.<br><br>BRIAN BAST, et al.,<br><br>    Defendants. | Case No. 17-cv-04194-WHO<br><br>**STATEMENT OF DECISION ON CALIFORNIA HEALTH AND SAFETY CODE § 1278.5 CLAIM** |

On July 18, 2023, after a week-long trial, the jury returned a unanimous defense verdict, finding that the defendants, Dr. Brian Bast and The Regents of the University of California ("the University"), did not retaliate against plaintiff Dr. Hieu Pham in violation of 42 U.S.C. § 1983 and California Labor Code § 1102.5. A third claim, asserted against the University under California Health and Safety Code § 1278.5, was tried before me. Like the jury, I find in favor of the University.

Simply put, Dr. Pham failed to prove by a preponderance of the evidence that he was retaliated against for making a complaint about the competence of a co-worker, Dr. Jennifer Perkins. He did not establish any link between that complaint and the decision of Dr. Bast, the Chair of the Department of Oral & Maxillofacial Surgery ("DOMS") at the University of California, San Francisco ("UCSF"), to reduce him from being a 50% Full-Time Equivalent ("FTE") staff dentist to a 40% FTE staff dentist. Dr. Pham had a one-year, renewable agreement with the University. The evidence showed that the only written description of Dr. Pham's job duties, from 2001, included some duties that he was no longer performing in 2016; that is when Dr. Bast learned that Dr. Pham held a 50% FTE appointment while only performing two days of work per week (40%) at the DOMS. The evidence further showed that although Dr. Bast made

1   repeated attempts to resolve this discrepancy, Dr. Pham refused to work an additional half-day or
2   otherwise substantiate his work.  In light of this, Dr. Bast ultimately reduced Dr. Pham's
3   appointment from 50% FTE to 40% FTE.

4   The evidence did not establish that Dr. Pham's patient safety complaint about Dr. Perkins
5   had any bearing on Dr. Bast's decision.  Dr. Bast took Dr. Pham's complaint about Dr. Perkins
6   seriously and performed a reasonable investigation.  He also gave Dr. Pham a raise after Dr. Pham
7   made his complaint and temporarily delayed a raise for Dr. Perkins.  There was no evidence of
8   retaliation against Dr. Pham for making the complaint.  Nor did the evidence establish that Dr.
9   Bast had a pattern and practice of retaliating against others who complained about problems in the
10  DOMS.

11  There is no doubt that Dr. Pham felt aggrieved by his reduced appointment and the
12  resulting reduction in pay and elimination of benefits.  The defendants did not contest that Dr.
13  Pham performed good work as a staff dentist and was profitable.  But he had no right to maintain
14  his 50% FTE appointment in perpetuity.  The evidence showed that Dr. Pham worked only two
15  days each week in the DOMS clinic (the other three days he spent at his private practice), did not
16  perform all of the duties that were described in the job description, and refused to justify why he
17  should be compensated at 50% FTE instead of 40% FTE.  The decision to reduce him to 40% FTE
18  was reasonable and not the result of retaliation for his complaint regarding Dr. Perkins in violation
19  of California Health and Safety Code § 1278.5.

20  **I.     FINDINGS OF FACT**

21  Below are my findings of fact.  They address the evidence that was material to my
22  evaluation of Dr. Pham's Health and Safety Code claim.  They do not include summaries of all the
23  witnesses who testified, many of whom were no longer DOMS employees when the pivotal events
24  took place in 2016 and 2017 or who had scant relevant information for the jury or me.

25  **A. Dr. Pham's Employment Agreement**

26  1. In August 2001, Dr. Anthony Pogrel, then the Chair of the DOMS, hired Dr. Pham to

1   work as a senior dentist, also known as a staff dentist. Tr. at 217:14-16, 842:21-843:2[1]; Ex. 16.

2         2. Dr. Pham was given a part-time, 50% FTE appointment. A written summary of his
3   duties described them as: 40% clinical duties, 5% Medical Director of the Outpatient Surgery
4   Center, and 5% "[o]ther duties as determined by the Chair in addition to maintaining all
5   interpersonal relationships with faculty, residents, students, management and staff on a mature,
6   courteous level." This was the only written description of his duties throughout the time of his
7   employment with the University that was presented at trial. Tr. at 216:4-6, 20-23; Exs. 16, 215.

8         3. According to the written summary, the 40% clinical duties included evaluating,
9   diagnosing, and treating patients "with conditions appropriate to the full scope of the practice of
10  oral and maxillofacial surgery." Dr. Pogrel testified that the 40% clinical duties were comprised
11  of "patient care activities," including preparing for surgery, ensuring surgery equipment was
12  available, reviewing patient history, communicating with the lab, following up with patients after
13  procedures, and making referrals. Ex. 16; Tr. at 844:19-842:12.

14        4. The 5% "other duties" determined at the Chair's discretion was not defined in the
15  written summary; in discussions between Dr. Pham and Dr. Pogrel, it was understood to include
16  the performance of cosmetic surgery, which the DOMS did not offer at the time. *Id*. at 749:8-13;
17  847:23-849:8; Ex. 16.

18        5. Dr. Pogrel did not promise Dr. Pham that he would be kept at 50% FTE as long as he
19  was bringing a certain amount of income to the University, even if he did not work two-and-a-half
20  days per week or regardless of the DOMS's financial condition, nor did Dr. Pogrel promise Dr.
21  Pham that he would always receive a certain level of salary, benefits, bonuses, or other perks. Tr.
22  at 853:12-21, 857:6-858:18; Ex. 201.

23        6. Because of his 50% FTE appointment, Dr. Pham received benefits from the University,
24  including medical, dental, vision, and retirement benefits, and paid vacation and sick leave. Tr. at
25  203:4-10; 226:7-13, 658:9-18; Ex. 61.

26        7. Dr. Pham's appointment, compensation, and other benefits were determined and

---

[1] "Tr." refers to the trial transcript, which is divided across six volumes and can be found at Docket Nos. 151-156.

3

renewed on an annual basis by the DOMS chair. Tr. at 528:25-529:9, 857:6-858:18; Ex. 201.

### B. Dr. Pham's Employment History

8. As part of his employment, Dr. Pham worked two days per week in the DOMS clinic, taught residents, gave lectures, and for a time served as the Medical Director of the Outpatient Surgery Center. During his tenure, Dr. Pham increased the use of the Surgery Center so that certain procedures could be performed there instead of in a hospital operating room. He also generated significant revenue for the DOMS. Tr. at 206:18-24, 238:9-241:23, 419:13-16, 448:21-449:16, 474:18-25, 671:8-12, 769:11-17, 846:17-847:4; Ex. 23.

9. By 2015, however, Dr. Pham was not performing some of the duties outlined in the 2001 written job description. He was replaced as the Medical Director of the Outpatient Surgery Center sometime between 2012 and 2014. And he stopped performing cosmetic surgeries in 2007 or 2008. Ex. 16; Tr. at 464:2-4, 487:19-20, 550:7-19, 741:10-742:7, 749:14-16, 846:17-847:4, 849:12-16, 869:11-25.

10. Some staff and faculty considered Dr. Pham to be discourteous and did not get along with him. No one questioned his skill as a staff dentist. Exs. 25, 216; Tr. at 850:12-851:19.

### C. Dr. Pham's Complaint about Dr. Perkins

11. In 2014, upon Dr. Pogrel's retirement, Dr. Bast became the interim Chair of the DOMS. Dr. Bast became the permanent chair in July 2015. Tr. at 397:9-16; 841:25-842:1.

12. On May 18, 2016, Dr. Pham and two other surgeons, Drs. Chirag Patel and Derek Park, met with Dr. Bast to voice their concerns about another surgeon, Dr. Perkins, who was the only female faculty surgeon in the DOMS working full-time. *Id.* at 529:22-24, 532:12-533:7, 690:13-691:23.

13. Dr. Pham told Dr. Bast that Dr. Perkins was practicing in a manner that risked patient safety and was below the standard of care, and relayed concerns about her knowledge of anesthesiology. *Id.* at 491:8-13, 532:12-533:7, 690:13-691:23.

14. After the meeting, Dr. Bast told Dr. Pham that he would address the situation. *Id.* at 534:12-17.

15. The same day, Dr. Bast initiated an investigation into Dr. Perkins's work. His

1    investigation began with speaking to the Dean of the School of Dentistry, the Associate Dean of

2    Clinical Affairs, the Vice Provost's office, and campus legal counsel to determine next steps.  *Id*.

3    at 534:20-536:2.

4        16. Dr. Bast met with Dr. Perkins to inform her of the concerns and his investigation.  He

5    pulled back her just-awarded salary increase and closed her clinic until he could complete the

6    investigation.  *Id*. at 536:3-537:19, 867:10-15.

7        17. As part of his investigation, Dr. Bast reviewed Dr. Perkins's clinical records and

8    patient charts.  He found that there were no abnormalities or reports of patient complications.  He

9    interviewed residents, faculty, and staff, and did not learn anything that made him concerned about

10   patient safety.  *Id*. at 537:3-540:14.

11       18. After concluding that there were no patient safety issues regarding Dr. Perkins, Dr.

12   Bast reopened Dr. Perkins's clinic and reinstated her salary increase.  *Id*. at 540:4-18.

### D.  The 50% and 40% FTE Discrepancy

14       19. In January 2016, prior to Dr. Pham's complaint about Dr. Perkins, he asked Dr. Bast

15   for a raise.  *Id*. at 405:20-22.

16       20. Dr. Bast had been a resident under Dr. Pham and valued him as a colleague.  Dr. Bast

17   had not had administrative responsibility for Dr. Pham before he became Interim Chair and had

18   not reviewed the terms of his appointment until Dr. Pham requested a raise.  At that time, Dr. Bast

19   discovered that Dr. Pham was classified at 50% FTE.  Dr. Bast also learned that Dr. Pham

20   received additional compensation for continuing education and travel.  *Id*. at 451:6-13, 452:14-18,

21   523:24-544:22, 546:20-547:4, 548:2-549:6.

22       21. Dr. Bast thought that Dr. Pham's appointment terms were erroneous, as he knew that

23   Dr. Pham worked for the University two days per week performing clinical work, not two-and-a-

24   half days.  He did not understand how Dr. Pham performed the additional 10% of work that would

25   total 50% FTE.  *Id*. at 548:2-550:19.

26       22. Between February 2016 and August 2016, Dr. Bast consulted with the DOMS

27   Manager, Mr. Jake Blackshear, and the University's Human Resources office, to understand Dr.

28   Pham's appointment and how to reconcile his compensation and work.  *Id*. at 548:17-549:6, 588-

20-589:2.

23. Dr. Bast attempted to discuss and resolve the discrepancy with Dr. Pham over the next several months. On August 4, 2016, Dr. Bast emailed Dr. Pham to notify him that he was working on Dr. Pham's annual reappointment letter. In that email, Dr. Bast noted the discrepancy between Dr. Pham's appointment and work. He asked Dr. Pham if Dr. Pham would be able to work an additional half-day per week—two-and-a-half days total—to maintain his 50% FTE appointment, or if he wanted to continue working two days per week at 40% FTE. He also noted that benefits were not available with a 40% FTE appointment. *Id.* at 550:24-551:8, 552:6-553:11; Ex. 208.

24. Dr. Pham did not respond to Dr. Bast's August 4, 2016, email. Tr. at 553:25-554:4.

25. On August 12, 2016, Mr. Blackshear emailed Dr. Pham seeking confirmation whether Dr. Pham would be adding a half day of work to maintain his 50% FTE appointment or would reduce his appointment to 40% FTE. Ex. 208.

26. Having received no response from Dr. Pham, Dr. Bast sent him another email on September 9, 2016, with an attached letter notifying Dr. Pham of his reappointment as a senior dentist. Tr. at 554:18-555:16; Ex. 204.

27. That letter maintained Dr. Pham's 50% FTE appointment, but stated that he would need to substantiate the work performed that would qualify as another half-day of work. The letter stated that

> In order to maintain this appointment at 50%, it is expected that 2.5 days of effort be dedicated to UCSF every week. Your current clinical schedule comprises 2.0 days or 40% effort. A report should be submitted monthly documenting the activities that make up the additional 10% effort.

Ex. 204.

28. The letter also noted that the DOMS would not be able to reimburse Dr. Pham for continuing education courses or travel. *Id.*

29. Dr. Bast had inherited a budget deficit of more than $1,000,000 when he became Chair of the DOMS. Dr. Bast believed that it would be unfair for the DOMS to pay for Dr. Pham's continuing education courses or travel expenses, particularly when other DOMS surgeons were not receiving the same benefits and when the DOMS faced a budget deficit. Tr. at 467:2-13,

556:26-557:3.

30. Dr. Pham never submitted monthly reports documenting his other work, as Dr. Bast requested. *Id*. at 561:19-563:11, 766:22-777:5.

31. On October 31, 2016, Dr. Bast emailed Dr. Pham, asking to meet with him to determine how Dr. Pham wanted to proceed with his appointment. *Id*. at 564:6-19; Ex. 203.

32. Dr. Pham did not respond to that email. Tr. at 564:20-21; Ex. 203.

33. Dr. Bast emailed Dr. Pham on November 4, 2016, and again requested a meeting. Tr. at 564:22-565:2; Ex. 203.

34. On November 7, 2016, Dr. Pham emailed Dr. Bast, refusing to meet and asking that Dr. Bast communicate with him by email instead. Tr. at 565:3-10; Ex. 203.

35. Dr. Bast emailed Dr. Pham the same day, again requesting a meeting. Tr. at 565:19-24; Ex. 203.

36. Dr. Pham emailed Dr. Bast back, repeating that he preferred to discuss any issues in writing. Tr. at 565:25-566:5; Ex. 203.

37. Dr. Bast then emailed Dr. Pham a directive to meet. Tr. at 566:6-20; Ex. 203.

38. Dr. Bast and Dr. Pham met on December 5, 2016. During that meeting, Dr. Bast reiterated Dr. Pham's options. Dr. Pham stated that he wanted to remain at 50% FTE without working the additional half-day. Dr. Bast asked if Dr. Pham's demand was to work two days per week but be paid 50%. Dr. Pham responded, "Yes," and left the meeting. Tr. at 462:11-22, 567:7-16, 575:24-576:3; Exs. 27, 87.

39. Dr. Bast followed up with Dr. Pham in a February 17, 2017, letter, which reflected their discussion during the December 5, 2016, meeting and stated that Dr. Bast had not received a monthly report from Dr. Pham documenting his work, nor seen evidence that Dr. Pham had been working at 50%. Tr. at 462:11-19, 570:3-7, Ex. 27.

40. The letter also notified Dr. Pham that effective March 24, 2017, he would be required to work an additional half-day—four hours per week—in the DOMS clinic. Ex. 27.

41. The letter stated that Dr. Pham would be reduced to 40% FTE if he did not work the additional four hours per week. *Id*.

7

42. On March 20, 2017, Dr. Pham emailed Dr. Bast a letter dated March 14, 2017, in which Dr. Pham rejected working any additional clinic hours.  He asserted that in addition to the two days that he worked in clinic, he spent time returning patient calls, making pre- and post-op calls, interfacing with the lab, calling referring dentists, ensuring surgical supplies were available, and performing patient work-ups.  Ex. 87.

43. Dr. Bast believed, and Dr. Pogrel confirmed in his testimony, that the work that Dr. Pham described in his March 14, 2017, letter was incidental to his clinical work, and patient- and clinic-related tasks that physicians in the DOMS performed without additional compensation.  *Id*.; Tr. at 574:2-577:25, 844:19-845:12.

44. Consequently, Dr. Bast determined that Dr. Pham did not perform any work that would justify an additional 10% appointment.  Because Dr. Pham also refused to work the additional half-day in clinic, Dr. Bast felt that he had no option but to reduce Dr. Pham to 40% FTE.  Having given Dr. Pham multiple opportunities to substantiate his work or work an additional half-day to satisfy the additional 10% of work required by his job description, Dr. Bast reclassified Dr. Pham to a 40% FTE appointment, effective March 27, 2017.  *Id*. at 569:2-5, 574:2-577:25, 578:12-18; Ex. 206.

45. Because benefits were not available under a 40% FTE appointment, the reduction resulted in a loss of Pham's benefits, and accumulated sick leave and vacation time.  Exs. 46, 206, 208; Tr. at 694:1-8.

46. Dr. Bast testified that he would have asked Dr. Pham to either work the additional half-day each week to satisfy his 50% FTE appointment or accept a 40% FTE appointment regardless of whether Dr. Pham complained about Dr. Perkins.  The two issues were completely independent.  Tr. at 546:20-548:1, 579:1-5.

47. Dr. Bast had approved an increase in Dr. Pham's rate of pay in August 2016—after Dr. Pham's complaint about Dr. Perkins and during the time Dr. Bast was attempting to reconcile the discrepancy in Dr. Pham's appointment.  *Id*. at 540:19-541:3; Ex. 208.

8

### E. "Me Too" Evidence[2]

48. Ms. Tina Valaris was a probationary employee who worked for the DOMS for about three weeks in January and February 2017. Her direct supervisor was Mr. Blackshear, who both hired and terminated her. Dr. Bast was present at the meeting where Valaris was terminated. Tr. at 271:2-272:4, 274:14-25, 288:23-289:12.

49. Valaris testified that she had reported to Mr. Blackshear concerns about billing discrepancies and timecard fraud, and to Dr. Bast concerns about timecard fraud and monies that she believed needed to be refunded to patients and potentially the government. Mr. Blackshear and Dr. Bast explained how the timecard issue had been addressed and why Ms. Valaris misunderstood the other issues, which did not amount to fraud. *Id.* at 276:22-283:5, 522:17-525:18, 811:1-11; 812:8-813:1.

50. Dr. Bast and Mr. Blackshear testified that Ms. Valaris was terminated because she did not meet their expectations in hiring: she missed or was late to meetings, made off-topic comments at meetings, had a "command-and-control leadership style" when they were hoping for a collaborative leader, and did not seek input or consensus from the staff. Mr. Blackshear further testified that staff members and faculty complained about Ms. Valaris's demeanor and style. Both Dr. Bast and Mr. Blackshear denied any intent to retaliate against her; it was clear to them that a hiring error had been made and that it should be corrected promptly. *Id.* at 520:5-521:17, 526:5-24, 813:2-815:6.

---

[2] Dr. Pham sought to introduce other "me too" evidence, from Dr. Dennis Song, Ms. Annamarie Abrantes-Li, and Dr. Mark Crane, to show a pattern of retaliation by Dr. Bast. *See* Order on Defendants' Motion in Limine #3 [Dkt. No. 117] 1:13-18. The defendants moved to exclude this evidence before trial. *See id*. In weighing the admissibility of this "me too" evidence, I considered the Ninth Circuit's order determining that there were sufficient genuine issues of material fact so as to survive summary judgment, the parties' briefing on the motions in limine, their offers of proof, the briefing and evidence presented to me on summary judgment, the briefing before the Ninth Circuit on appeal, and a decision from the Hon. Saundra Brown Armstrong concerning Dr. Song. *See id*. at 2:25-3:4. I also reviewed the deposition testimony of Drs. Song and Crane, Ms. Abrantes-Li, and Ms. Valaris. After careful consideration, I excluded all but Ms. Valaris's "me too" testimony, finding that the evidence regarding the others was not closely related to Dr. Pham's circumstances and theory of the case, for reasons explained in my Order. *See generally id*.

9

## II.   CONCLUSIONS OF LAW

1. California Health and Safety Code § 1278.5 prohibits a health facility from discriminating or retaliating against an employee "for presenting complaints concerning the quality of patient care to other members of the medical staff, the facility, or other responsible entities." *Bonni v. St. Joseph Health Sys.*, 11 Cal. 5th 995, 1015 (2021); *see also* Cal. Health & Safety Code § 1278.5.

2. The statute defines "discriminatory treatment" as including but not limited to "discharge, demotion, suspension, or any unfavorable changes in, or breach of, the terms or conditions of a contract, employment, or privileges of the employee . . . or the threat of any of these actions." Cal. Health & Safety Code § 1278.5(d)(2).

3. There is no right to a jury trial for this claim, and the University did not agree to try it to the jury. *See Shaw v. Superior Ct.*, 2 Cal. 5th 983, 987 (2017); Dkt. No. 104 at 7:17-21.[3]

4. To prove his section 1278.5 claim, Dr. Pham had to show by a preponderance of the evidence that: (1) he presented a grievance, complaint, or report to the health facility or medical staff; (2) regarding the quality of patient care; and (3) the health facility retaliated against him for doing so. *Alborzi v. Univ. of S. Cal.*, 55 Cal. App. 5th 155, 178-79 (Cal. Ct. App. 2020); Cal. Health & Safety Code § 1278.5.

5. To prove that he was retaliated against, Dr. Pham had to show by a preponderance of the evidence that: (1) he engaged in protected activity under section 1278.5; (2) the University subjected him to an adverse employment action; and (3) a causal link existed between the two. *See Jadwin v. Cnty. of Kern*, 610 F. Supp. 1129, 1144 (E.D. Cal. 2009) (citing *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1105 (9th Cir. 2008)); *see also Armin v. Riverside Cmty. Hosp.*, 5 Cal. App. 5th 810, 830 (Cal. Ct. App. 2016).

6. It is undisputed that Dr. Pham presented a complaint regarding the quality of patient

---

[3] The parties dispute how much Dr. Pham's section 1278.5 claim overlaps with the claims that were tried by the jury, and thus whether I am bound by the jury's factual determinations or whether I may reach any interpretation of the jury's verdict that is supported by the evidence. *See* Dkt. No. 158 ¶ 9; Dkt. No. 159 ¶ 3.  It seems clear that there is almost complete overlap.  But I need not decide this because my ruling on the section 1278.5 claim aligns with the jury's verdict.

1  care when he complained to Dr. Bast about Dr. Perkins on May 18, 2016, and also that Dr. Pham
2  was reduced from 50% FTE to 40% FTE, effective March 27, 2017.  But Dr. Pham did not meet
3  his burden to show that he was retaliated against.  Dr. Bast discovered the discrepancy in Dr.
4  Pham's 50% FTE appointment before Dr. Pham complained about Dr. Perkins.  Dr. Bast made
5  repeated efforts to reconcile the discrepancy, including by asking Dr. Pham to work an additional
6  half-day or otherwise account for work that would justify the 50% FTE appointment.  Dr. Pham's
7  lack of responsiveness or willingness to engage with Dr. Bast's inquiry was not reasonable.  It is
8  also worth noting that Dr. Bast also gave Dr. Pham a raise after Dr. Pham made his complaint.

7. Dr. Bast took Dr. Pham's complaint about Dr. Perkins seriously and conducted a reasonable investigation into his concerns, including alerting his superiors and others at the University, reviewing Dr. Perkins's patient records, interviewing faculty and staff, delaying a promised raise for Dr. Perkins, and temporarily closing her clinic.  No inference of retaliation can be drawn from Dr. Bast's thorough investigation.  The investigation did not substantiate Dr. Pham's claims.  There is no credible evidence that there was a connection between the employment issue raised by Dr. Bast and Dr. Pham's complaint about Dr. Perkins.

8. Dr. Pham points to the testimony of Ms. Valaris, the DOMS practice manager, as evidence that Dr. Bast retaliated against those who made complaints to him.  *See* Dkt. No. 158 ¶¶ 29-30.  The evidence does not bear out this argument.  Instead, it shows that Ms. Valaris was a probationary employee, supervised by Mr. Blackshear, who was terminated because she did not satisfy Dr. Bast's and Mr. Blackshear's expectations.  The concerns she reported were misplaced.  Her termination is in no way corroboration of Dr. Pham's argument that Dr. Bast retaliates against those who make complaints about the conduct of the DOMS.

9. Dr. Pham did not show by a preponderance of the evidence that Dr. Bast's decision to reduce him from 50% FTE to 40% FTE was because of Dr. Pham's complaint about Dr. Perkins.  Rather, the evidence shows that the University would have taken the same action regardless.

10. Dr. Pham contends that the jury's defense verdict on his section 1983 claim against Dr. Bast and his section 1102.5 claim against the University was based on additional elements of those claims that the defendants strongly argued at trial.  Dkt. No. 158 ¶¶ 10-11.  For example, Dr.

11

Pham's section 1983 claim, which was based on the First Amendment, required proving that he spoke as a private citizen and not pursuant to his official duties. *Id.* ¶ 10 (citing Final Jury Instr. Nos. 18-19). Dr. Pham's section 1102.5 claim required proving that he had reasonable cause to believe that he was reporting a violation of a statute, rule, or regulation. *Id*. ¶ 10 (citing Final Jury Instr. Nos. 20-21). The jury rendered general verdicts and made no clear finding as to the bases for its decisions. *See* Dkt. No. 150. So while Dr. Pham's point about the elements of those causes of action is correct, the heart of the section 1983 and the section 1102.5 claims is that Dr. Pham had to show by a preponderance of the evidence that he was retaliated against because of his complaint about Dr. Perkins. He did not come close to proving this.

For the foregoing reasons, I find that Dr. Pham failed to meet his burden of proof with respect to his claim for a violation of California Health and Safety Code § 1278.5. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: August 14, 2023



William H. Orrick
United States District Judge